UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/19/19

JUDITH SMITH, derivatively on behalf of 50 East 69th Street Corporation; DAVID EZEKIEL FAIRBANK, derivatively on behalf of 50 East 69th Street Corporation; and JUDITH SMITH as CO-TRUSTEE OF THE NANCY A. FAIRBANK, JOHN TAYLOR FAIRBANK AND NATHANIEL DAVID FAIRBANK TRUSTS, derivatively on behalf of 50 East 69th Street Corporation,

Plaintiffs,

-v-

JAMES W. SMITH, III; NANCY K. SMITH; LUCINDA SMITH HAY; and CENTER FOR SPECIALTY CARE, INC.,

Defendants,

-and-

50 EAST 69th STREET CORPORATION,

Nominal Defendant.

17 Civ. 6648 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This intra-family dispute involves claims of a breach of fiduciary duty. The plaintiff family members allege that the defendant family members managed a family-owned East Side rental townhouse in a manner that brought them unfair personal advantage. The three plaintiffs are Dr. Judith Smith ("Judith"), her husband David Ezekiel Fairbank ("David"), and Judith in her capacity as co-trustee of her three children's trusts. They bring suit derivatively on behalf of the 50 East 69th Street Corporation, in which they are minority, non-voting shareholders. They sue Judith's mother, Nancy K. Smith ("Nancy"); her brother, James W. Smith, III ("James III"); her sister, Lucinda Hay ("Lucinda") (collectively, the "Individual Defendants"); the Center for

Specialty Care ("CSC"); and nominal defendant 50 East 69th Street Corporation ("50 East"). Plaintiffs allege that the defendants breached their fiduciary duty to 50 East in connection with negotiating, renegotiating, and ultimately terminating the Lease Agreement with CSC. CSC was 50 East's sole tenant and an entity in which the Individual Defendants each had a direct or an indirect financial interest.

With discovery complete, defendants move for summary judgment. For the following reasons, the Court grants that motion in full as to plaintiffs' claims against CSC and in part as to their claims against the Individual Defendants and nominal defendant 50 East.

## I.     Background

### A.     Factual Background[1]

Plaintiffs' claims arise from a series of business decisions made by defendants on behalf of 50 East involving CSC. In particular, plaintiffs' claim that defendants caused 50 East's lease with CSC to be modified, and later terminated, on terms unfairly disadvantageous to 50 East.

---

[1] The Court draws its account of the underlying facts from: the parties' respective submissions on the motion for summary judgment, including defendant's Statement Pursuant to Local Civil Rule 56.1, *see* Dkt. 64 ("Def. 56.1"); plaintiffs' response, *see* Dkt. 69 ("Pl. 56.1 Resp.); the Declaration of Ronald G. Blum, Esq., in support of defendants' motion, Dkt. 65 ("Blum Decl."), and attached exhibits; the Declaration of Frank J. Convertini, Esq., in support of defendant's motion, Dkt. 66 ("Convertini Decl."), and attached exhibits; and the declaration of Christine M. Wallace in opposition to defendants' motion, Dkt. 68, and attached exhibits.

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein. When facts stated in a party's 56.1 statement are supported by testimonial or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

### 1. Ownership of 50 East

In May 1979, Judith's father Dr. James W. Smith formed 50 East under New York law. Dkt. 59 ("JSF") ¶ 1. Until approximately November 2017, 50 East owned a townhouse located at 50 East 69th Street, New York, New York 10021 (the "Building"). *Id.* ¶ 3. At the time of 50 East's incorporation, Dr. James W. Smith was its sole shareholder. *Id.* ¶ 2. He died in August 2006. *Id.* ¶ 8.

At present, as at all relevant times, 50 East has 23 shareholders who collectively hold a total of 1,200 shares. *Id.* ¶ 17. Three are voting shareholders: the James W. Smith Family Trust, dated 8/16/2000, which owns 90 voting shares; the Nancy Smith Family Trust, which owns 90 voting shares; and the James W. Smith 2006 Family Trust, which owns 20 shares. *Id.* ¶ 18. The remaining 1,000 shares are non-voting and are spread across 20 shareholders, seven of whom are parties to this action. *Id.* ¶ 19. Judith, David, and the trusts of each of their three children, of which Judith serves as trustee, own six non-voting shares, for a total of 30 shares. *Id.* ¶¶ 20–24. Plaintiffs' collective share of 50 East is therefore 2.5%. *Id.* ¶ 25. James III and Lucinda each own six non-voting shares. *Id.* ¶¶ 26–27. Nancy does not own any shares. *Id.* ¶ 28. Defendants' collective share of 50 East is therefore 1.0%.

As to 50 East, Nancy is the president and a director, *id.* ¶ 9, James III is a vice president and a director, *id.* ¶ 10, and Lucinda is a vice president, secretary, and former director, *id.* ¶ 11.

### 2. The Surgical Ambulatory Center and the CSC Lease Agreement

In the early- to -mid-1980s, 50 East renovated the Building extensively "to house an ambulatory surgery center, with operating rooms, medical examination rooms, recovery rooms, doctors' offices and patient waiting areas." Dkt. 69 ("Pl. 56.1 Resp.") ¶ 1; *see also* JSF ¶ 4. The center was the first such facility of its kind in Manhattan. Pl. 56.1 Resp. ¶ 2.

On November 1, 1988, 50 East entered into a Lease Agreement (the "Lease") with CSC. JSF ¶ 31. The Lease initially "had a 20-year term, set a $900,000 annual rent, and required CSC to pay 'all costs, expenses, and obligations of every kind to the leased property.'" *Id.* ¶ 16 (quoting Dkt. 65-6 ("Lease") at 7). Dr. James W. Smith signed the Lease on behalf of both 50 East and its tenant CSC. *See* Lease at 4.

CSC is a corporation organized under New York law. JSF ¶ 5. At the time of CSC's incorporation, defendant Dr. James W. Smith was its sole shareholder. *Id.* ¶ 6. At present, Nancy owns 40% of CSC; James III, 15%; and Lucinda, 15%. Pl. 56.1 Resp. ¶ 5. The parties dispute the exact duration of Judith's affiliation with CSC, but, from either 2000 or 2001 until 2004, she served as an administrator of CSC, assisting her father. *Id.* ¶ 4.

During CSC's tenancy, it negotiated nine amendments to the Lease with 50 East. As with the original Lease, Dr. James W. Smith signed the first three amendments on behalf of both 50 East and CSC. *See* Dkts. 65-7 ("First Amendment); 65-8 ("Second Amendment"); 65-9 ("Third Amendment"). The final six amendments, however, were signed by James III and Lucinda, with one signing on behalf of 50 East and the other signing on behalf of CSC. *See* Dkt. 65-10 ("Fourth Amendment") at 5–6; Dkt. 65-11 ("Fifth Amendment") at 4; Dkt. 65-12 ("Sixth Amendment") at 3; Dkt. 65-13 ("Seventh Amendment") at 4; Dkt. 65-14 ("Eighth Amendment") at 3; Dkt. 65-15 ("Ninth Amendment") at 3. The Court summarizes the pertinent terms of these amendments below, as plaintiffs centrally claim the negotiated rental terms to have been unfair to 50 East.

### a.     *First Amendment*

The First Amendment to the Lease is dated December 1, 1993. JSF ¶ 32. It provided that the total amount of annual rent was to increase, to $1,251,000. First Amendment at 1. It also

provided that CSC must pay "'costs, expenses[,] and obligations of the Building 'except insofar as the Landlord, at its sole discretion, may elect to bear such costs, expenses[,] and obligations from any Supplemental Rent payable by Tenant.'" *Id.* at 2.

      *b.    Second Amendment*

The Second Amendment to the Lease is dated January 1, 2002. JSF ¶ 34. It extended the term of the Lease to September 1, 2012. Second Amendment at 1. It provided that CSC, if not in default, could extend the Lease for five years (*i.e.*, until December 31, 2007). *Id.* The annual rent for this first period was $640,000, a little more than half of that set by the First Amendment. *Id.*; *see also* Pl. 56.1 Resp. ¶ 20. Under the Second Amendment to the Lease, if CSC were not in default at the end of that first extended period, then CSC had the option to renew the Lease for a second five-year-period (*i.e.*, until September 1, 2012). Second Amendment at 1; Pl. 56.1 Resp. ¶ 19. The annual rent for this second period was $765,000. Second Amendment at 1; *see also* Pl. 56.1 Resp. ¶ 20.

Judith was an administrator of CSC at the time the Second Amendment was executed. Pl. 56.1 Resp. ¶ 4. She testified that the rent reduction provided by the Second Amendment had been designed to "help breathe some life" into CSC. *Id.* ¶ 21 (quoting Dkt. 65-2 ("Judith Dep.") at 102).

      *c.    Third Amendment*

The Third Amendment to the Lease is dated December 11, 2003. JSF ¶ 35; Third Amendment at 1. It provided, *inter alia*, that 50 East "shall have the right, at its election and in its sole and absolute discretion, to terminate the Lease by providing Tenant at least ninety (90) days prior written notice of its intent to exercise such right." Third Amendment at 1.

###### d.    *Fourth Amendment*

The Fourth Amendment to the Lease is dated October 30, 2007 and was retroactively effective to June 1, 2007. JSF ¶ 36; Fourth Amendment at 1. It provided that, from June 1, 2007 to December 31, 2007, CSC's annual rent would be $602,000; from January 1, 2008 to December 31, 2008, its annual rent would be $1.1 million; from January 1, 2009 to December 31, 2009, its annual rent would be $1.4 million; from January 1, 2010 to December 31, 2010, its annual rent would be $1,449,000; from January 1, 2011 to December 31, 2011, its annual rent would be $1,499,715; from January 1, 2012 to December 31, 2012, its annual rent would be $1,552,205; and from January 1, 2013 to July 31, 2013, its annual rent would be $937,143.69. Fourth Amendment at 1

###### e.    *Fifth Amendment*

The Fifth Amendment to the Lease is dated February 24, 2010 and was retroactively effective to December 31, 2008. JSF ¶ 37; Fifth Amendment at 1. It provided that, from January 1, 2009 to December 31, 2009, CSC's annual rent would be $900,000; and, from January 1, 2010 to December 31, 2010, its annual rent would be $999,996. Fifth Amendment at 2.

###### f.    *Sixth Amendment*

The Sixth Amendment to the Lease is dated October 15, 2011 and was retroactively effective to January 1, 2011. JSF ¶ 38; Sixth Amendment at 1. It provided that, from January 1, 2011 to December 31, 2011, CSC's annual rent would be $1.2 million; from January 1, 2012 to December 31, 2012, CSC's annual rent would be $1.3 million; and from January 1, 2013 to December 31, 2013, CSC's annual rent would be $758,331. Sixth Amendment at 2.

### g.    Seventh Amendment

The Seventh Amendment to the Lease is dated April 16, 2012 and was retroactively effective to January 1, 2012. JSF ¶ 39; Seventh Amendment at 1. It provided that, from January 1, 2012 to December 31, 2012, CSC's annual rent would be $1,299,999.96. *See* Seventh Amendment at 1. It set the following ensuing annual rents for CSC: from January 1, 2013 to December 31, 2013, $1,338,999.96; from January 1, 2014 to December 31, 2014, $1,379,169.96; from January 1, 2015 to December 31, 2015, $1,420,545.00; from January 1, 2016 to December 31, 2016, $1,463,161.44; and from January 1, 2017 to December 31, 2017, $1,507,056.24. *Id.* at 1–2.

### h.    Eighth Amendment

The Eighth Amendment to the Lease is dated December 10, 2013 and was retroactively effective to January 1, 2013. JSF ¶ 40; Eighth Amendment at 1. It provided that, from January 1, 2013 to December 31, 2013, CSC's annual rent would be $557,916. Eighth Amendment at 1. It set the following ensuing annual rents for CSC: from January 1, 2014 to December 31, 2014, $600,000; from January 1, 2015 to December 31, 2015, $1,328,651; and, for each year between January 1, 2016 and December 31, 2019, $1,876,198. Eighth Amendment at 2.

### i.    Ninth Amendment

The Ninth Amendment to the Lease is dated December 10, 2015 and was retroactively effective to January 1, 2015. JSF ¶ 41; Ninth Amendment at 1. It provided that, for each year from January 1, 2015 to December 31, 2016, CSC's annual rent would be $300,000. Ninth Amendment at 1. For each year between January 1, 2017 to December 31, 2018, the annual rent would be $1,876,198; and from January 1, 2019 to December 31, 2019, the annual rent would be $4,481,048. *Id.* at 1–2.

### 3.    50 East's Mortgage with People's United Bank

In August 2012, 50 East refinanced the mortgage on the Building and thereby obtained an $8 million loan from People's United Bank (the "Mortgage"). JSF ¶ 29. Under the terms of the Mortgage, 50 East was required have a financially viable tenant. Pl. 56.1 Resp. ¶ 12. Further, Section 5.1(n)(iv) of the Mortgage provided that an "Event of Default" included any "materially adverse change" in "the business, condition (financial or otherwise), result of operations or prospects of [the] Primary Tenant," which the Mortgage listed as CSC. *Id.* ¶ 12 (quoting 65-20 ("Mortgage") at 48). Under the Mortgage, an "Event of Default" would trigger a higher interest rate for 50 East; accelerate payment on the entire, outstanding debt; and possibly lead to foreclosure of the Building. *Id.* ¶ 13 (quoting Mortgage at 8, 49).

The parties emphasize different implications of 50 East's decision to refinance the Mortgage. Defendants note that "[t]he 2012 refinancing allowed 50 East to pay off a prior mortgage and provided cash to 50 East." *Id.* ¶ 11. Plaintiffs note that the cash that 50 East received from the refinancing enabled the payment of dividends to shareholders. *Id.* Between 2008 and 2015, 50 East paid its shareholders dividends totaling $3,461,050. *Id.* ¶ 30.

### 4.    CSC's Financial Difficulties Beginning in 2012

After 2006, CSC did not pay any distributions to its shareholders. *Id.* ¶ 32. Between 2007 and 2009, CSC paid compensation to James III and Lucinda. *Id.* ¶ 31. After 2009, CSC did not pay them—or any party to this lawsuit—any compensation. *Id.* ¶ 32.

Beginning in 2012, CSC, the Building's sole tenant, began to suffer financial difficulties. In 2012, CSC operated at a net loss of $177,065; in 2013, at a net loss of $579,958; and in 2014, at a net loss of $856,241. *See* Dkts. 66-2 ("2011 & 2012 Audited Financial Statement") at 3; 66-3 ("2012 & 2013 Audited Financial Statement") at 4; 66-4 ("2013 & 2014 Audited Financial Statement") at 4.

In 2013, CSC's auditors stated that its financial conditions "raise substantial doubt about its ability to continue as a going concern." 2012 & 2013 Audited Financial Statement at 1. In light of CSC's financial struggles, CSC's financial statement for the years ending 2013 and 2014 reported that CSC "will be unable to meet its obligations as they become due without additional capital or financing." 2013 & 2014 Audited Financial Statement at 16.

### 5. CSC's Attempted Sale to the Buyers Group

In December 2013, CSC hired the Camden Group to structure a plan to sell CSC. Pl. 56.1 Resp. ¶ 42. The parties dispute the purpose of CSC's directors (who also were directors of 50 East) in making this decision. Defendants contend that the directors' goal was to allow 50 East to maintain ownership of the Building, given the Mortgage's requirements, by transferring ownership of tenant CSC to a more solvent entity. *See* Def. 56.1 ¶ 42. Plaintiffs depict the plan to sell CSC as motivated solely by a desire to advance CSC's interests. *See* Pl. 56.1 Resp. ¶¶ 42–43. CSC solicited "bids from hospitals, physician groups, and existing surgery centers." *Id.* ¶ 44. The bids CSC considered required any eventual buyer to continue operating an ambulatory surgery center in the Building in compliance with zoning laws, and to enter a new long-term lease with 50 East. *Id.* ¶ 45.

In 2015, CSC and 50 East accepted a bid from a group of doctors who owned a network of such ambulatory surgical centers (the "Buyers' Group"). *Id.* ¶ 46. Under the terms of the deal, the Buyers' Group would have paid $5 million for CSC's assets, license, and goodwill and would have agreed to a 10-year lease ("Buyers' Lease") with 50 East. *Id.* The Buyers' Lease provided that the Buyers' Group would pay annual rent of $2.2 million in the first year, with the annual rent increasing over time. *Id.* ¶ 47. Had this deal come to fruition, 50 East would have received more than $25 million in rent over 10 years and would have maintained ownership of the Building. *Id.* ¶ 48.

The Buyers' Group, however, defaulted on its obligations to CSC and 50 East. It failed both to pay 50 East a security deposit or any rent owed and to pay CSC the purchase price. *Id.* ¶ 49. The Individual Defendants unsuccessfully attempted to salvage the deal. *Id.* ¶ 50. After the Individual Defendants failed to find a new buyer, CSC, in May 2016, ceased operations. JSF ¶ 7; Pl. 56.1 Resp. ¶ 51.

In summer 2016, CSC and 50 East filed a lawsuit against the Buyers' Group for breach of contract in New York State Supreme Court. Pl. 56.1 Resp. ¶ 52. In November 2017, the state court granted CSC and 50 East's joint summary judgment motion as to liability. *Id.* ¶ 53. The damages phase of that lawsuit remains pending. *Id.* ¶ 54.

### 6. Loans by Defendants' Affiliates to CSC

As of September 2016, CSC was paying real property taxes, utilities, and insurance on the Building. *Id.* ¶ 55 (citing 65-3 "Hay Dep." at 82).

To enable CSC to pay these obligations and to remain open, loans to CSC had been made by James III, through JABCO Holdings, Inc. ("JABCO"), a company he owned, and Richard Hay, Lucinda's husband. *Id.* ¶ 59. Promissory notes filed as exhibits by plaintiffs indicate that these loans spanned at least from June 30, 2011, when Richard Hay made a $150,000 loan to CSC, until August 22, 2016, when JABCO made a $116,600 loan to CSC. *See* Dkt. 68-2 ("Notes Payable") at 11–25. These promissory notes reflect that James III, JABCO, and Richard Hay had loaned at least $2,456,600 to CSC during that period. *See id.*

Frank Convertini, the accountant for both 50 East and CSC since each company's founding, testified that "except to maximize the return on the assets of 50 East, there would be no reason [for these persons] to loan money to CSC." Dkt. 65-5 ("Convertini Dep.") at 149. Convertini further testified that most of these loans had been made as CSC was winding down its business, to keep CSC solvent. *Id.* at 148. Had the loans not been made, Convertini testified,

CSC would have been unable to meet its financial obligations and would have gone into default, triggering under the Mortgage foreclosure of the Building. *Id.* at 149.

### 7. 2016–2017: The Lease Termination Agreement and Sale of 50 East

On August 9, 2016, three months after CSC ceased operations, People's United Bank notified 50 East that CSC's closure constituted an event of default under the Mortgage and that People's United Bank would accelerate the Mortgage. JSF ¶ 29.

On September 30, 2016, 50 East and CSC entered into a Lease Termination Agreement ("Termination Agreement"). Pl. 56.1 Resp. ¶ 70. It stated that 50 East "desire[d] to sell the Premises vacant and free of any leases or tenants and ha[d] requested that [CSC] terminate the Lease and vacate the Premises." Dkt. 68-10 ("Termination Agreement") at 1. It provided that 50 East would pay CSC $4 million in consideration for CSC's agreement to terminate the Lease. *Id.* It also released both 50 East and CSC from their respective obligations under the Lease. *Id.* at 1–2. It further provided that in any action between 50 East and CSC to enforce the agreement, the prevailing party would be entitled to payment of attorneys' fees. *Id.* at 2.

Of the $4 million that it agreed to pay CSC, 50 East paid CSC $3.73 million (the "Termination Payment") in September 2016. Pl. 56.1 Resp. ¶ 72; Convertini Decl. ¶ 6. The record does not disclose why less than the agreed-upon $4 million was paid to CSC.

A significant issue involves what 50 East's $3.73 million Termination Payment to CSC represented. Defendants represent that $1,241,870 of the $3.73 million was used to reimburse CSC for "building improvements" that CSC had paid for on the Building, including HVAC mechanical equipment and repairs, roof replacement and repair, brick pointing and repair, plumbing fixtures, elevator restoration, window restoration, and other mechanical and structural repairs. Convertini Decl. ¶ 6 ("[T]he payment of $3,730,000 that 50 East made to CSC in September 2016 in connection with termination of the Lease included that amount"). Defendants

11

represent that a further $850,000 was used to fund CSC so that it could pay 50 East unpaid obligations that CSC owed to 50 East; had this sum not been paid, 50 East would have had to recognize this sum as a bad debt. Convertini Dep. at 142–43. Defendants do not specify what the remaining approximately $1.6 million of the Termination Payment to CSC represented, including the extent to which it was used to reimburse loans that CSC had received from defendants' affiliates. Defendants note that CSC's tenancy was not due to expire until December 2019, Def. 56.1 ¶ 70, the implication being that it was necessary for 50 East to pay additional money to CSC to induce it to end its tenancy early, to enable 50 East to market the Building, unencumbered by the Lease, to potential buyers, *id.* ¶ 69.

Plaintiffs dispute several aspects of defendants' characterization of these events. As to the source of funding for the improvements to the Building, plaintiffs dispute defendants' claim that CSC—not 50 East—had paid for "the restoration of the façade, roofing, brick pointing, et cetera" using proceeds of the 2012 mortgage refinancing. Pl. 56.1 Resp. ¶ 73 (citing Convertini Dep. at 21). As to the need for a payment to induce CSC to end its tenancy early, plaintiffs assert that CSC had already defaulted in lease obligations as of September 30, 2016, the date the Termination of Lease agreement was entered into, including by nonpayment of rent. Pl. 56.1 Resp. ¶ 69. They note that under the Lease, CSC's default gave 50 East the right to re-enter the premises and to oust CSC, while retaining the right to collect unpaid rent from CSC. *Id.* CSC's existing default, plaintiffs argue, obviated any need for 50 East to pay CSC to induce it to end its tenancy early.[2]

---

[2] Defendants—quoting testimony by 50 East accountant Convertini—counter that CSC's rents had been "paid" or were "if not paid, accrued." Def. 56.1 ¶ 36 (quoting Convertini Dep. at 106). However, defendants do not make clear what Convertini meant by an "accrued" rent other than that tenant CSC had failed to make the required rent payment and that the unpaid rent was overdue.

Plaintiffs also dispute whether, to the extent the Termination Payment to CSC was made in order to enable CSC to repay some or all of the $2,456,600 in loans that had been made to it by affiliates of the Individual Defendant (*i.e.*, JABCO and Richard Hay), 50 East was legally obliged upon sale of the Building to pay CSC so as to enable it to repay such loans. If not, plaintiffs allege, 50 East's decision to do so was needless. Defendants represent that CSC used the loaned funds to enable it to pay tax obligations associated with the Building "and to continue to run its operations." Hay Dep. at 81. But, on the record presented to the Court on defendants' motion for summary judgment, there is no evidence of a written loan agreement or any recorded commitment by 50 East to backstop CSC's loans.[3] *See* Dkt. 68-3 ("James III Dep.") at 180–81 ("There was no written guarantee. . . . [W]e thought that that was the prudent way to proceed, given we didn't want to have an additional default with our lender."). Plaintiffs appear to challenge similarly 50 East's decision to fund CSC the $850,000 that CSC then used to pay its outstanding debts to 50 East. Plaintiffs therefore depict as self-dealing, and needless, whatever part of the Lease Termination payment was made in order to enable CSC to repay its lenders or to clear its debts to 50 East.

In November 2016, 50 East notified shareholders of a meeting scheduled for December 16, 2016 to vote on whether, *inter alia*, to approve the terms of the lease termination and to approve the sale of the Building for an amount not less than $50 million. *Id.* ¶ 74. On December 7, 2016, David emailed his son Ezekiel, the beneficiary of one of the plaintiff trusts, expressing

---

[3] Separate from the loans to CSC, defendants, citing Hay's testimony, represent that Richard Hay and JABCO "also loaned money to 50 East when it struggled to meet its obligations." Def. 56.1 ¶ 60 (citations omitted). These loans spanned the period from June 30, 2016 to December 16, 2016 and totaled $3,746,991. Notes Payable at 2–10. Plaintiffs contend that money loaned by Nancy, James III, Richard Hay, and JABCO to 50 East was used for a different purpose: to help 50 East pay the Lease Termination payment to CSC that plaintiffs contend was unnecessary. Pl. 56.1 Resp. ¶ 60.

his plan to "delay the shareholder meeting indefinitely" and, if unable to do so, to sue. *Id.* ¶ 75 (quoting Dkt. 65-29 at 2). 50 East postponed the meeting until January 2017, after discussions between counsel for 50 East and plaintiffs. *Id.* ¶ 76.

On January 20, 2017, 50 East's voting shareholders voted unanimously, over plaintiffs' objection, to approve the termination of the Lease and the sale of the Building. ¶¶ 77–78.

In November 2017, 50 East sold the Building for, as reported, the second-highest price for a residential townhouse in Manhattan. *Id.* ¶¶ 78–79. 50 East sent its shareholders a letter notifying them of the Building's sale and stating that the net sales proceeds were approximately $35 million. *Id.* ¶ 81. 50 East further notified its shareholders that, after the sale, it would pursue a like-kind exchange under Section 1031 of the Internal Revnue Code of 1986 and that shareholders who wanted to withdraw, instead of participating in that exchange, must give notice by September 15, 2017. *Id.* ¶ 82. Plaintiffs provided notice that they did not wish to participate in the exchange. *Id.* ¶ 83.

On November 14, 2017, Convertini notified plaintiffs that they could redeem their shares at $26,430.99 per share. *Id.* ¶ 84. In exchange for accepting this sum, plaintiffs would have been obliged to sign a general release that would:

> release and forever discharge 50 East 69th Street Corporation, its shareholders, officers, directors, including without limitation James W. Smith, III, Nancy K. Smith, Constance S. Plimpton, Peter F. Smith and Lucinda S. Hay . . . of and from all, and all manner of, actions, causes of action, suits . . ., which plaintiff Judith Smith and the Fairbanks and their heirs . . . ever had, now have, or may hereafter have, known and unknown, against 50 East 69th Street Corporation, its shareholders, officers and directors . . . including without limitations, any and all claims which were raised or could have been raised in the action captioned *Smith v. Smith*, Case No. 17-cv-00648, filed in the United States District Court, Southern District of New York.

Dkt. 66-1 (Redemption Letter) at 1. Plaintiffs declined the proposed redemption. Pl. 56.1 Resp. ¶ 86. On the record before the Court, it thus appears that 50 East to date has not paid any money

to plaintiffs as a result of the Building's sale. At the same time, no evidence has been adduced that 50 East has refused, categorically, to remit to plaintiffs any share of the sale proceeds.

### 8. Theories of Harm to 50 East from Defendants' Alleged Breaches

Plaintiffs assert that defendants breached their duties to 50 East by unjustifiably (1) relieving CSC of its rent obligations to 50 East and (2) paying CSC a termination fee to exit the lease. *Id.* ¶ 87. Plaintiffs are not accountants and did not engage an expert to opine on the damages to 50 East on account of these breaches. David, however, prepared a document that calculates damages of more than $27 million. *Id.* ¶ 88. These include: (1) $14,385,168, representing rent payments that CSC was excused from having to pay, (2) $4 million, representing the face amount of the Lease Termination Payment; and (3) $6 million, representing lease default guarantees arising out of the Buyers' Group's breach of the Buyers' Lease with 50 East. *Id.* ¶¶ 90–91. David's damages tabulation also includes smaller sums relating to the sale of fixtures, improvements to the Building, legal fees, severance packages to employees, and a 2006 gift made to James III. *Id.* ¶ 91.

### B. Procedural History

On August 31, 2017, plaintiffs filed the complaint, claiming a breach of fiduciary duty and gross mismanagement. Dkt. 1. On November 10, 2017, defendants answered. Dkt. 13.[4] On June 11, 2018, plaintiffs moved to amend to add new claims and parties, Dkt. 36. On June 18, 2018, defendants filed a motion in opposition. Dkt. 41. On June 25, 2018, plaintiffs filed a reply. Dkt. 43. On July 5, 2018, the Court granted the motion to amend in part, allowing plaintiffs to add Lucinda and CSC as defendants but prohibiting new claims. Dkt. 44. On July

---

[4] On December 19, 2017, the Court held an initial pretrial conference, *see* Dkt. 15, issued a civil case management plan and scheduling order, Dkt. 22, and referred the case to Magistrate Judge Henry B. Pitman for settlement. Dkt. 23. The Court, on request, twice modified the case management deadlines. Dkt. 29, 35.

12, 2018, plaintiffs filed a first amended complaint. Dkt. 45. On July 20, 2018, defendants answered. Dkt. 48.

On August 21, 2018, the Court held a pre-motion conference in anticipation of defendants' summary judgment motion. Dkt. 50. On October 8, 2016, the parties filed a joint statement of undisputed facts. Dkt. 59. On October 16, 2018, the parties filed a proposed stipulation and order dismissing the gross mismanagement claim with prejudice and without costs. Dkt. 60. On October 17, 2018, the Court issued that order. Dkt. 61.

On October 22, 2018, defendants filed a motion for summary judgment, Dkt. 62, a supporting memorandum of law, Dkt. 63 ("Def. Mem."), a Rule 56.1 Statement, Dkt. 64, a supporting Declaration of Ronald G. Blum, Esq., and accompanying attachments, Dkt. 65, and a supporting Declaration of Frank J. Convertini, Esq., and accompanying attachments, Dkt. 66. On November 5, 2018, plaintiffs filed an opposing memorandum of law, Dkt. 67 ("Pl. Mem."), the Declaration of Christine M. Wallace, Esq., and accompanying attachments, Dkt. 68, and a Rule 56.1 Counter-Statement, Dkt. 69. On November 12, 2018, defendants filed a reply. Dkt. 70 ("Def. Reply").

## II.     Applicable Legal Principles

Defendants move for summary judgment on plaintiffs' remaining claim—against all defendants for breach of fiduciary duty. After reviewing the governing standards, the Court considers plaintiffs' claim against CSC, and then plaintiffs' claim against the remaining defendants.

### A.     Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation marks omitted).

### B.    Legal Standard Governing Breach of Fiduciary Duty

Under New York law, to establish a claim of breach of fiduciary duty a plaintiff must prove: "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Leighton v. Poltorak*, No. 17 Civ. 3120 (LAK) (KNF), 2018 WL 2338789, at *7 (S.D.N.Y. May 23, 2018) (citing *Johnson v. Nextel Commc'ns*, 660 F.3d 131, 138 (2d Cir.

2011)).  Under New York law, a corporate director bears a fiduciary duty to the company and must act in "good faith and with that degree of care which an ordinarily prudent person in like position would use under similar circumstances." N.Y. Bus. Corp. Law § 717(a).  In addition, "where damages are sought for breach of fiduciary duty . . . the plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability." *LNC Invs., Inc. v. First Fid. Bank, N.A. New Jersey*, 173 F.3d 454, 465 (2d Cir. 1999).

Under New York law, the business judgment rule "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *Auerbach v. Bennett*, 47 N.Y.2d 619, 629 (1979). Where "a corporate director or officer has an interest in a decision," however, "the business judgment rule does not apply." *In re Croton River Club, Inc.*, 52 F.3d 41, 44 (2d Cir. 1995).  "A director is considered 'self-interested' in a transaction where she 'will receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally.'" *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016) (quoting *Marx v. Akers*, 88 N.Y.2d 189, 644 N.Y.S.2d 121, 666 N.E.2d 1034, 1042 (1996)).  "'Once a prima facie showing is made that directors have a self-interest in a particular corporate transaction, the burden shifts to them to demonstrate that the transaction is fair and serves the best interests of the corporation and its shareholders.'" *Id.* at 152 (quoting *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir.1984)).

New York law protects interested-party transactions so long as they are structured with protections similar to those in an arms-length transaction. *See In re Kenneth Cole Prods., Inc.*, 27 N.Y.3d 268 (2016).  Section 713 of New York's Business Corporation Law provides that a contract between corporations involving interested directors is not void or voidable because of

the directors' financial interest so long as the material facts "are disclosed in good faith or known to the shareholders entitled to vote thereon, and such contract or transaction is approved by vote of such shareholders." N.Y. Bus. Corp. Law § 713(a)(2).

## III.    Discussion

### A.    Plaintiffs' Claims Against CSC

CSC moves for summary judgment on the claims against it, on the grounds that the evidence does not support that CSC—as opposed to the Individual Defendants—owed plaintiffs a fiduciary duty.

A fiduciary duty arises "when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 599 (2d Cir. 1991) (internal quotation marks and citations omitted). As 50 East's tenant, CSC would owe a fiduciary duty to 50 East and its shareholders only if a special relationship creating that duty exists. *See, e.g.*, *In re Caulfield*, 192 B.R. 808, 818 (Bkrtcy. E.D.N.Y.1996) (citing cases and noting that the "landlord-tenant relationship is not ordinarily a fiduciary one"). Accordingly, insofar as plaintiffs seek to impose a fiduciary duty on CSC, they must come forward with evidence enabling the factfinder to find "a special relationship creating such a duty." *Clifford v. Hughson*, 992 F. Supp. 661, 670 (S.D.N.Y. 1998).

Plaintiffs here do not point to any evidence that supports a finding that CSC, a tenant, owed a fiduciary duty to 50 East, its landlord. To be sure, the persons comprising these two corporate entities overlap. Indeed, plaintiffs characterize the overlap as complete, stating that "since 2006 . . . the directors and officers of CSC and 50 East have been the same." Pl. Mem. at 17. But although such persons held duties to 50 East in their capacities (e.g., as directors) at 50 East, that does not alter the legal character of the duties owed to 50 East by CSC. And although directors of a corporation owe a fiduciary duty to that corporation, *see In re Sabine Oil & Gas*

*Corp.*, 547 B.R. 503, 556 (Bankr. S.D.N.Y.), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016), plaintiffs have not cited any authority that a corporation's legal duties to a separate corporation vary depending on the extent to which they share directors. Not surprisingly, plaintiffs, on summary judgment, do not seriously press the claim that CSC owed fiduciary duties to 50 East.

Because plaintiffs have failed to muster evidence that a special relationship existed between CSC and 50 East giving rise to fiduciary duties on CSC's part, the Court grants CSC's summary judgment motion and therefore dismisses plaintiffs' fiduciary claim against it.

**B.      Claims Against Individual Defendants**

The Individual Defendants do not dispute that they owe plaintiffs a fiduciary duty. Nor can they: It is black letter law that the directors and corporate officers of a corporation owe a fiduciary duty to that corporation. *Gully v. Nat'l Credit Union Admin. Bd.*, 341 F.3d 155, 165 (2d Cir. 2003). Here, the Individual Defendants were all directors or corporate officers of 50 East. *See* JSF ¶¶ 9–11. Therefore, the existence of such a duty, the first element of plaintiffs' breach of fiduciary duty claim, is met. However, whether the evidence could support a finding for plaintiffs on the second and third elements—whether the Individual Defendants breached that duty and whether plaintiffs suffered any damages as a result—present closer questions.

Plaintiffs pursue two distinct theories as to how the Individual Defendants breached their fiduciary duties to plaintiffs, causing them damages. First, they claim that the Individual Defendants breached their duty by amending the Lease with CSC so as to charge reduced (and, according to plaintiffs, below-market) annual rents, most of which had retroactive effect. *See* Pl. Mem. at 13, 18. Second, they claim that the Individual Defendants breached their duty by making a Lease Termination Payment to CSC without first obtaining shareholder approval and at a point when CSC was, in plaintiffs' view, already in default of its obligations under the Lease,

including by failing to pay accrued rent. *See id.* at 14–15, 19.   The Court addresses each theory in turn.

### 1.    Lease Amendments

Plaintiffs' first theory is that the Individual Defendants, in their capacities as directors and/or officers of 50 East, acted self-interestedly and in bad faith, by allowing below-market rents to be set retroactively for CSC, a corporate tenant which members of the defendant group owned and operated.   Plaintiffs base this theory largely upon the last six amendments to the Lease.   James III and Lucinda negotiated each of these amendments and made each amendment retroactively effective.   Pl. Mem. at 4.   Each of these amendments lowered retroactively the amount of rent that CSC owed corresponding to earlier periods of the Lease and increased the annual rent due in coming years to make up for the shortfall.   *Id.* at 13.   For example, the Eighth Amendment was executed on December 10, 2013, but made retroactively effective to January 1, 2013.   Eighth Amendment at 1.   The effect of this amendment was to decrease the annual rent collected in calendar year 2013 from $1,338,999.96 to $557,916.   *Id.*   The Eighth Amended set an annual rent for calendar year 2014 of $600,000, *id.*, but 50 East amended the lease once again on December 10, 2015 and retroactively set the rent to be collected at $300,000, Ninth Amendment at 1.   Plaintiffs argue that these amendments gave CSC a needless benefit and an unfair discount relative to the fair market rent, to the detriment of 50 East, in derogation of defendants' duties to CSC.   Pl. Mem. at 13.

Plaintiffs also point to the terms of the Ninth Amendment as evidence of the Individual Defendants' bad faith.   The Ninth Amendment was executed *after* 50 East appeared to have found a new tenant who would acquire CSC, *see* Pl. Mem. at 13, yet it set an annual rent of $300,000 for the first two years and a much higher annual rent of $1,876,198 and $4,481,048 for

the third and fourth years, respectively. Ninth Amendment at 1–2. Plaintiffs argue that the structure of the Ninth Amendment was established in bad faith because those larger, balloon payments in the third and fourth years of the agreement were, from the start, theoretical and unrealistic and would never have been paid by CSC. Pl. Mem. at 14.

In moving for summary judgment on this claim, the Individual Defendants counter that the undisputed facts show that these business decisions were fair and served 50 East's interests at the time. Further, the Individual Defendants note, to the extent plaintiffs' claim is that various rent revisions enabled CSC to pay below-market rents, plaintiffs have not come forward with any evidence (e.g., an expert report) as to what market rents were.

At the threshold, the business judgment rule does not apply to the serial decisions to lower CSC's annual rent obligations (and defendants have not claimed that it does). As directors of both CSC and 50 East, JSF" ¶¶ 11–12; Dkts. 65-10–65-15, James III and Lucinda had a clear conflict of interest when they set and amended the terms of CSC's Lease. For these decisions to have been protected by the business judgment rule, the non-conflicted shareholders thus would have had to have approved the Lease amendments. The summary judgment record does not reveal any such vote or approval.

Given plaintiffs' *prima facie* showing of the Individual Defendants' self-interest in the rents paid by CSC, the burden therefore shifts to them to demonstrate that the transaction is "'fair and serves the best interests of the corporation and its shareholders.'" *Alphonse Hotel Corp*, 828 F.3d at 152 (citation omitted). The Individual Defendants argue that the undisputed evidence supports that the rents set, including by means of amendments with retroactive effect, were fair and in CSC's best interests. Def. Mem. at 17–18. Most central, the Individual Defendants argue that the amendments served the vital function of maintaining a tenant, and CSC specifically, in

the Building. *Id.* at 6. Under the terms of the Mortgage that 50 East renegotiated in August 2012 with People's United Bank, both parties agree, any material adverse change in the financial condition of 50 East's tenant, CSC, would amount to an Event of Default that would accelerate payments on the Mortgage. Pl. 56.1 Resp. ¶ 12. This obligation would fall on 50 East. *See id.* The Individual Defendants argue that 50 East's ability to avoid triggering this devastating consequence was therefore tied to CSC's financial stability. Def. Mem. at 18–19. Thus, the Individual Defendants argue, CSC and 50 East had aligned interests in CSC's financial solvency. And, they argue, the undisputed evidence supports that CSC required significant rent reductions to remain viable. The Individual Defendants cite New York case law that "[i]ndividuals who act in a dual capacity as directors of two corporations owe the same duty of good management to both corporations, and this duty is to be exercised in light of what is best for both companies." *Am. Int'l Grp., Inc. v. Greenberg*, 23 Misc. 3d 278, 288 (N.Y. Sup. 2008), *aff'd*, 60 A.D.3d 483 (1st Dep't 2009). They argue that their decisions to modify the Lease, to relieve CSC of immediate rent burdens it could not pay consistent without experiencing a material adverse change in its condition, were consistent with their fiduciary duties to 50 East as well as CSC. Def. Mem. at 19.

The Individual Defendants further argue that when CSC's financial troubles became too acute to solve in this fashion, they exercised reasonable care in trying to find a successor tenant. *See id.* They note, and plaintiffs concede, that CSC and 50 East both solicited bids to acquire CSC and, in 2015, and accepted a deal with a third party, the Buyers Group, that stood to result in 50 East collecting an initial annual rent of $2.2 million and receiving more than $25 million in rent over the full term of the Buyers' Lease. Pl. 56.1 Resp. ¶¶ 45–48. When the Buyers Group reneged on the deal, the Individual Defendants note, they acted responsibly, pursuing the Buyers

Group in still-ongoing litigation, and obtaining a judgment as to liability with damages yet to be determined. Def. Mem. at 19.

The Individual Defendants also note that, contrary to plaintiffs' claim that they operated 50 East so as to enrich themselves via their ownership of CSC, they took steps to preserve CSC's financial capital. *See id.* The record, they note, does not reflect any issuance of dividends by CSC, or any payments to the Individual Defendants by CSC, after 2009. *Id.*; Pl. 56.1 Resp. ¶ 32. Between 2006 and 2015, CSC did not pay out any dividends to the defendant directors, Pl. 56.1 Resp. ¶ 32, and, after 2009, CSC did not pay compensation to any members of the Smith family, *id.* In contrast, the Individual Defendants note, between 2008 and 2015, 50 East paid out $3,461,050 in dividends to its shareholders. *Id.* ¶ 30. These facts, the Individual Defendants argue, bely the claim that the rent reductions were unfair to 50 East. Def. Mem. at 19–20.

Viewing the evidence in the light most favorable to plaintiffs, the Court holds that no reasonable fact finder could find that the Individual Defendants breached their fiduciary duty to 50 East when they revised the amount of annual rent charged to CSC. Plaintiffs' argument as to why the modified rent terms were unfair to 50 East boils down to the fact that the revisions were, in part, retroactive. But Individual Defendants have come forward with undisputed evidence explaining the legitimate purpose served by these revisions. As the Individual Defendants emphasize and as is undisputed, the terms of the Mortgage required 50 East to have a financially viable tenant. Pl. 56.1 Resp. ¶ 12. It is further undisputed that CSC began to struggle financially in 2012, *id.* ¶ 37, and that its audited financial statements reveal that it operated at a loss in each of 2012, 2013, and 2014, the years in which the Seventh and Eighth Amendments to the Lease were executed and to which the rent reductions related, *id.* ¶ 38. Specifically, CSC suffered losses of $579,958 in 2013 and $856,241 in 2014. *Id.* ¶ 40. In addition, in 2013, CSC's

auditors noted that CSC's financial conditions "raise substantial doubt about its ability to continue as a going concern." *Id.* ¶ 39. CSC's 2013 and 2014 financial statements further state that CSC "will be unable to meet its obligations as they become due without additional capital or financing." *Id.* ¶ 41.

Plaintiffs have not come forward with any evidence to challenge the accuracy of CSC's financial statements. Nor have they adduced any evidence that calls into question the auditors' contemporaneous assessment that CSC was at risk of becoming insolvent absent financial relief. Nor have they come forward with evidence indicating that CSC, in any way, utilized the cost savings so as to enrich its owners or give them a financial windfall. On the contrary, the undisputed evidence is that, from 2009 forward, CSC did not pay the Individual Defendants any dividends or other compensation. Nor, finally, to the extent that plaintiffs posit that the renegotiated rents were below market rates, have plaintiffs come forward with independent evidence (e.g., an expert's analysis) of prevailing market rents for a facility with the unusual characteristics for which 50 East was outfitted (*i.e.*, as a surgical ambulatory center).

Under these circumstances, plaintiffs' bare claim that it was unfair to 50 East, so as to mark a breach of fiduciary duty by the defendant directors, to renegotiate CSC's rent obligations is unsupported by sufficient evidence to reach a jury. The Individual Defendants have come forward with concrete support, anchored in the terms of the Mortgage and CSC's contemporaneous financial statements and auditor assessments, for these decisions. Plaintiffs, in contrast, have not mustered contrary evidence.

Further, as context, it is undisputed that, under the prior leadership of James W. Smith, 50 East had also retroactively reduced CSC's annual rent, when 50 East agreed to the 2002 Second Amendment to the CSC's Lease, which cut nearly in half CSC's annual rent obligations. *Id.*

¶¶ 20–21. As Dr. Smith's daughter, plaintiff Judith, then a CSC administrator, acknowledged in her deposition, the rent reductions under the 2002 Second Amendment had been designed to "help breathe some life" into CSC and to enhance its financial stability. Judith Dep. at 102. This history reinforces the Individual Defendants' unrefuted showing that the rent reductions, viewed in context, were fair and not an act of bad faith.

Summary judgment is therefore warranted for defendants on plaintiffs' theory that the Individual Defendants, by causing 50 East to restructure CSC's annual rent obligations, breached their fiduciary duties. The uniform evidence instead is that, by acting to keep the financially precarious CSC solvent, the Individual Defendants avoided triggering an acceleration of the payments on 50 East's refinanced Mortgage. These actions helped 50 East to keep a tenant in the Building, thereby enabling 50 East to retain the Building long enough, in the end, to negotiate its lucrative sale. And the uniform deposition testimony of the Individual Defendants was that their business purpose in restructuring CSC's rent obligations was just that: to preserve 50 East's control of the Building and to avoid triggering an acceleration of the Mortgage. *See* Hay Dep. at 96 ("Loans made by family members to CSC allowed us to continue to own the building for an extended period of time, and that was beneficial to 50 East, because during that time the building appreciated, as did all—my understanding, all New York real estate."); James III Dep. at 174 ("50 East wanted CSC to continue to operate so it could find its replacement tenant, so, you know, our backs were up against the wall."). The record evidence marshalled on summary judgment would not enable a finder of fact to find otherwise, other than by speculation. Accordingly, the Court grants the Individual Defendant's motion for summary judgment as to this theory of fiduciary breach.

### 2. Lease Termination Payment

#### a. Breach

The Court turns now to plaintiffs' second theory of liability. Plaintiffs claim that the Individual Defendants breached their fiduciary duty to 50 East by making the $3.73 million Lease Termination Payment to CSC. Pl. Mem. at 11. Plaintiffs contend that this payment to a company affiliated with the Individual Defendants was unnecessary, when viewed from the perspective of 50 East's interests.

The Court considers first the threshold argument by the Individual Defendants that because the shareholders of 50 East voted to approve this transaction, the decision by 50 East's interested directors to pay $3.73 million to CSC is protected by the business judgment rule. *See* Def. Mem. at 21.

The record before the Court does not permit the Court to resolve this question with certainty. On the one hand, the conflict of interest of the individual Defendants here was acute. The $3.73 million payment to CSC enabled CSC, *inter alia*, to pay back debts owed to affiliates or family of the Individual Defendants: JABCO, James III's corporation, and Lucinda's husband. *Id.* at 24; *see also* Pl. 56.1 Resp. ¶ 60. And accountant Convertini, whose testimony the Individual Defendants embrace, testified that the Lease Termination Payment was an attempt to avoid, for JABCO and for Lucinda's husband, the "worst possible [taxation] position." Convertini Decl. at 140.

At the same time, 50 East's voting shareholders voted unanimously to approve the Lease Termination Payment. Pl. 56.1 Resp. ¶ 78. And plaintiffs, although not voting shareholders, had an opportunity to weigh in as to the payment. Defendants delayed the meeting to accommodate a request by plaintiffs. *Id.* ¶ 76. And plaintiffs' counsel attended the meeting and, before the vote, articulated plaintiffs' objections (albeit to no avail). *See id.* ¶ 77.

Were the voting shareholders non-conflicted, under New York law, these circumstances, without more, would appear to shift the burden to plaintiffs, under the business judgment rule, to demonstrate that the transaction was unfair. The record as the parties have presented it to the Court on summary judgment, however, does not educate the Court as to the circumstances of the three voting shareholders, each of which is a trust: the James W. Smith Family Trust (90 voting shares); the Nancy Smith Family Trust (90 voting shares); and the James W. Smith 2006 Family Trust (20 voting shares). *Id.* ¶ 18. The parties have not elaborated on potentially relevant factors. These include which persons controlled these trusts, whether they included any of the Individual Defendants, and, if not, whether these persons, like the Individual Defendants, stood to benefit, even indirectly, from a decision by 50 East to pay CSC $3.73 million in connection with the termination of CSC's lease. The parties have also not briefed associated legal issues. These include whether and in what circumstances the business judgment rule applies in cases of shareholder approval where some or all of the approving shareholders had a personal interest in the decision at issue but where other shareholders did not.

In the ensuing discussion, the Court assumes, *arguendo*, that the business judgment rule does apply. The burden would thus fall to plaintiffs at trial to show that the Lease Termination Payment was unfair and undertaken in bad faith, and on summary judgment, to adduce enough evidence to support a verdict to that effect. As developed below, the assembled circumstances would permit a jury to infer unfairness and bad faith, such that plaintiffs' challenge to the Lease Termination payment must be resolved by the jury at trial.

Specifically, plaintiffs contend that three aspects of the Lease Termination Payment are unfair to 50 East and indicative of self-interested decisions made in bad faith, not with 50 East's interests at heart.

First, plaintiffs contend that CSC was already in breach of the Lease of the time that 50 East and CSC discussed terminating the lease. Therefore, plaintiffs argue, 50 East could have terminated the Lease and thereby released the Building of that encumbrance, facilitating the sale of the building. It was unnecessary, plaintiffs argue, to make a nearly $4 million payment to CSC to induce it to walk away from a lease on whose rent payments CSC had fallen far behind. Pl. Mem. at 11, 16. Plaintiffs argue that the Individual Defendants made a discretionary decision to make this payment, because it stood to benefit them. In particular, plaintiffs note, the Lease Termination payment enabled CSC to deploy its money in ways that benefitted the Individual Defendants. These included repaying loans that a family member (Richard Hay) and an affiliated business entity (JABCO) had made to CSC which 50 East was not legally obliged to cover. Further, plaintiffs appear to argue, the Lease Termination payment enabled CSC to pay 50 East $850,000, which, per the agreement between 50 East and CSC, CSC used to repay its debts (presumably largely back rent) to 50 East. Plaintiffs contend that 50 East was not obliged to subsidize the repayment of debts owed to it. They argue that CSC and and/or its owners, unassisted by largesse from 50 East, should have borne these liabilities. *See, e.g., id.* at 11, 16–17.

Second, plaintiffs argue that the Individual Defendants breached their fiduciary duty to 50 East by choosing not to require, as a condition of the Lease Termination Agreement, that CSC earmark, towards reimbursing CSC for that payment, any monetary relief it receives from the lawsuit that Building landlord 50 East and tenant CSC have brought against the Buyers' Group. *Id.* at 14–15. Plaintiffs observe that CSC has sought $8 million in damages from the Buyers, twice the amount of the Lease Termination Payment, *id.* at 15. But, they note, the Individual

Defendants appear not to have considered whether, if successful in the Buyers Group litigation, to commit to having CSC repay 50 East that discretionary payment. *Id.* at 15.

Third, plaintiffs claim that the process by which the Lease Termination Agreement was approved was unfair. They contend that the Individual Defendants did not seek shareholder approval of the Lease Termination Agreement until after that payment was already made. *Id.* at 15. They contend that the Lease Termination Payment was paid in September 2016, whereas the shareholder meeting at which a vote on the transaction was first scheduled for December 16, 2016, and did not occur until January 20, 2017. *Id.* at 11–12, 15. This procedural irregularity, plaintiffs contend, made all but inevitable the approval of that payment and/or reflects that a determination to approve it had been made, *sub silentio*, well before the meeting.

The Individual Defendants defend the above actions. As to the Loan Termination Payment, they contend that it was fair. They dispute that the Individual Defendants "knowingly breached a duty to 50 East." Def. Mem. at 19. Rather, they argue, the decision to make that payment and the uses and conditions to which it was put all stood to facilitate the lucrative sale of the Building. *See id.* at 18. They argue that the loans by Richard Hay and JABCO to prop up CSC "would not have been made but to protect the Building and prevent foreclosure," *id.* at 11–12, 24, and that 50 East had, at least implicitly, guaranteed these loans. They further contend that the Loan Termination Payment benefited 50 East and CSC alike, insofar as it made it easier for 50 East to enlist a successor "long-term, stable tenant of 50 East." *Id.* at 19. In addition, they argue, the eventual sale of the Building—at a lofty price—retrospectively evidences the wisdom of 50 East's directors in acting decisively to remove the CSC Lease encumbering the Building. *Id.* at 24. Although the Individual Defendants are less explicit on this point, they appear, too, to defend the absence of a condition requiring CSC to use proceeds of the litigation with the Buyers

Group to reimburse 50 East for making the Lease Termination payment, and to defend as procedurally regular the 50 East shareholder vote on that payment. *See id.* at 13; *see also* Def. Reply at 8.

The Court's assessment is that, for purposes of resolving the instant motions, the various components of plaintiffs' claim of a breach of duty relating to 50 East's Lease Termination Payment are properly evaluated in tandem, rather than in atomized fashion. The Court's further assessment is that plaintiffs' claim that the decision to cause 50 East to make this payment, and the decisions ancillary to it that plaintiffs challenge, breached defendants' duties as directors of 50 East cannot be reliably resolved on summary judgment. Unlike 50 East's serial decisions to amend the Lease, whether these decisions were fair to CSC and whether they were made in good or bad faith turn on material disputes of fact. They are matters in which minds may differ, and they turn on disputed inferences as to the motivation and need for the payment, as to which a jury's assessment of witness credibility may prove decisive.

One central such disputed fact concerns whether the Lease Termination Payment was necessary to get CSC to vacate the Building. As noted, plaintiffs contend that 50 East already had a valid basis to terminate the lease because CSC was in violation of the Lease, such that a nearly $4 million payment to induce CSC to terminate the Lease early was gratuitous. Pl. Mem. at 11, 16. Although the Individual Defendants make a contrary argument, they have not adduced evidence that would preclude a factfinder from finding with plaintiffs on this point.

A second such disputed fact concerns the decision to cause 50 East to pay CSC an amount that would enable it to fully repay the loans that affiliates of the Individual Defendants had made to CSC and to repay debts that CSC owed 50 East. Pl. Mem. at 16–17. Plaintiffs contend that 50 East had never committed to cover these expenses and that causing it to do so

31

was a discretionary decision animated by the Individual Defendants' economic self-interest. *Id.* at 16–17. Although the Individual Defendants make the contrary argument (and argue, at least as to the loan repayment, that 50 East had implicitly agreed to repay the loans), a jury would not be obliged to credit defendants' version. The Individual Defendants have not adduced any documentary proof of such a contemporaneous commitment by 50 East. A jury could reasonably infer that this discretionary payment was unnecessary and that it was not in the self-interest of 50 East—which had already repeatedly excused CSC from its rent obligations over the years and which was then owed large sums by CSC—to gift CSC an additional $3.73 million.

More generally, the circular and apparently discretionary nature of the payments approved by 50 East's interested directors in connection with the Lease Termination—in which 50 East made payments to CSC to enable CSC effectively to pay 50 East or cover third-party debts of its affiliates to 50 Easts—inherently raises questions of fairness that a jury could reasonably resolve in either side's favor. These questions appear to turn, *inter alia*, on factfinders' assessment of the validity of the Individual Defendants' stated justifications for these acts. The assembled record requires that a jury, not the Court on summary judgment, resolve the purpose with which conflicted directors acted. The related question whether 50 East ought to have insisted that CSC earmark some of its litigation recovery against the Buyers Group for repayment of the Lease Termination Payment likewise appears to implicate similar questions. It may also turn on whether the jury finds the Lease Termination Payment justified. To the limited degree that the parties' briefs have engaged with this specific issue, the record does not permit resolution on summary judgment.

The Court therefore holds that, to the extent that plaintiffs' claim of a fiduciary duty breach relates to the Lease Termination Payment made by 50 East to CSC, this claim cannot be resolved on summary judgment.

        *b.*     *Damages*

The Individual Defendants also move for summary judgment on damages. They contend that, even if plaintiffs could establish a breach of duty, there is insufficient evidence on which a jury could find damages. Defendants argue that the Lease Termination Payment facilitated the sale of the Building at a high price, and that plaintiffs have not adduced evidence "that the Building could have sold for a comparable price with a three-year Lease between CSC and 50 East still in place." Def. Mem. at 24.

The Court denies defendants' motion. The Individual Defendants avoid the crux of plaintiffs' theory of liability—namely, that 50 East could have terminated the Lease with CSC at the same time as it did *without* making a termination payment to CSC. Were the jury to credit that contention, plaintiffs could fairly argue that 50 East would have found the same buyer for the building at the same price. Damages to 50 East would then, presumably, be measured by the amount of the Lease Termination Payment. Alternatively, to the extent the jury finds some termination payment warranted but the $3.73 million figure excessive, plaintiffs may argue that 50 East and CSC—particularly given their common directors—could and should have agreed upon a lesser payment on the same timetable as the Lease Termination Payment. Damages to 50 East would then, presumably, be measured by the excessive component of that payment. In either event, the Individual Defendants' theory that the sale of the Building would not have come about does not follow. Plaintiffs' theory of damages—that 50 East was induced by its conflicted directors to relinquish too much money to CSC—is viable.

Accordingly, the Court denies the Individual Defendants' motion for summary judgment on plaintiffs' breach of fiduciary duty claim, to the extent that that theory rests on the decision to cause 50 East to make the Lease Termination Payment to CSC.

## CONCLUSION

For the reasons above, the Court grants the motion for summary judgment as to plaintiffs' claim of fiduciary duty breach against CSC, but denies that motion as to the claim of a fiduciary duty breach against the Individual Defendants. As to the Individual Defendants, plaintiffs' claim of a breach of duty in connection with 50 East's Lease Termination payment is viable, but the claim of a breach of duty in connection with the reduction of CSC's rent obligations is not.

This case will now proceed to trial. The Court directs the parties to confer, and by April 26, 2019, to file a joint letter apprising the Court of the anticipated length of the trial. Barring notice that the case is on track for a prompt settlement, the Court expects then promptly to set a schedule requiring submission, in late May, of a Joint Pretrial Order and the other required pretrial filings set forth in the Court's Individual Rules.

The Court respectfully directs the Clerk of Court to terminate CSC as a defendant in this case and to terminate the motion pending at Dkt. 62.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: April 19, 2019
New York, New York

34